**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| SEASE BEARD | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| DORIS FALKENRATH, individually and in her official capacity as warden of Jefferson City Correctional Center, | ) ) ) ) |
| | ) |
| NATHAN FALTER, individually and in his capacity as a Jefferson City Correctional Officer, | ) ) ) ) |
| JEREMY EPPS, individually and in his capacity as a Jefferson City Correctional Officer, | ) ) ) ) |
| First Name Unknown Carignan, individually and in his capacity as a Jefferson City Correctional Officer | ) ) ) ) |
| First Name Unknown Matherly, individually and in his capacity as a Jefferson City Correctional Officer | ) ) ) ) |
| First Name Unknown Graff, individually and in his capacity as a Jefferson City Correctional Officer | ) ) ) ) |
| Jacki Petri, individually and in her capacity as a Jefferson City Correctional Caseworker | ) ) ) ) |
| Todd Matthew, individually and in his capacity as a Jefferson City Correctional Center Official | ) ) ) ) |

WD No: 2:21-cv-04211-SRB

Jason Lewis, individually and in his )
capacity as Deputy Division Director of the )
Missouri Department of Corrections, )
Division of Adult Institutions )
 )
First Name Unknown Mauler, individually )
and in his capacity as a Jefferson City )
Correctional Officer )
 )
First Name Unknown Sonne, individually )
and in his capacity as a Jefferson City )
Correctional Officer )
 )
First Name Unknown Dobbins, individually )
and in his capacity as a Jefferson City )
Correctional Officer )
 )
First Name Unknown Bade, individually )
and in his capacity as a Jefferson City )
Correctional Officer )
 )
SCOTT KITNER, individually and in his )
capacity as a Jefferson City Correctional )
Caseworker )
 )
JOHN DOES 1-5, individually and in their )
capacity as Jefferson City Correctional )
Officers )
 )
JANE/JOHN DOE 6, individually and in )
his/her capacity as assistant warden of )
Jefferson City Correctional Center, )
 )
JANE DOE 7, Individually and in her )
capacity as a medical professional with )
Jefferson City Correctional Center )

Defendants

**PLAINTIFF SEASE BEARD'S AMENDED COMPLAINT**

Plaintiff Sease Beard by and through counsel, and pursuant to the Civil Rights Act of 42

U.S.C. § 1983, states as follows for her Amended Complaint:

## PARTIES

1.      Plaintiff Sease Beard is a natural person and is a citizen of the state of Missouri. She is currently incarcerated at Jefferson City Correctional Center ("JCCC").

2.      Defendant Doris Falkenrath is a natural person and, upon information and belief is employed as Warden of the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Falkenrath was acting under color of state law.

3.      Defendant Nathan Falter individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Lieutenant Correctional Officer at  the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Falter was acting under color of state law.

4.      Defendant Jeremy Epps individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Sergeant Correctional Officer II at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Epps was acting under color of state law.

5.      Defendant FNU Carignan individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Correctional Officer I at the Jefferson City Correctional Center in Missouri.  At all times relevant to this complaint, Carignan was acting under color of state law.

6.      FNU Matherly, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Correctional Officer I at the Jefferson City Correctional Center in Missouri.  At all times relevant to this complaint, Matherly was acting under color of state law.

7.     FNU Graff, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Sergeant Correctional Officer II at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Graff was acting under color of state law.

8.     Jacki Petri, individually and in her official capacity as a Jefferson City Correctional officer, is a natural person and, upon information and belief is employed as a Caseworker at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Petri was acting under color of state law.

9.     Todd Matthew, individually and in his official capacity as a Jefferson City Correctional Center Officer, is a natural person and, upon information and belief is employed as a Function Unit Manager at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Matthew was acting under color of state law.

10.     Jason Lewis, individually and in his official capacity as an employee of the Missouri Department of Corrections, is a natural person and, upon information and belief is employed as the Deputy Division Director of the Missouri Department of Corrections' Division of Adult Institutions. At all times relevant to this complaint, Lewis was acting under color of state law.

11.     FNU Mauler, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Correctional Officer at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Mauler was acting under color of state law.

12.     FNU Sonne, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a

4

Correctional Officer at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Sonne was acting under color of state law.

13.    FNU Dobbins, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Correctional Officer at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Dobbins was acting under color of state law.

14.    FNU Bade, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Correctional Officer at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Bade was acting under color of state law.

15.    Scott Kitner, individually and in his official capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as a Caseworker at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Kitner was acting under color of state law.

16.    John Does 1-5, individually and in their capacity as Jefferson City Correctional Officers, are natural persons and, upon information and belief are employed as Correctional Officers at the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Does 1-5 were acting under color of state law.

17.    Jane/John Doe 6, individually and in her/his capacity as a Jefferson City Correctional Officer, is a natural person and, upon information and belief is employed as assistant warden of the Jefferson City Correctional Center in Missouri. At all times relevant to this complaint, Doe 6 was acting under color of state law.

18.     Jane Doe 7, individually and in her capacity as a Jefferson City Correctional employee, is a natural person and, upon information and belief is employed or contracted as a nurse of the Jefferson City Correctional Center in Missouri.  At all times relevant to this complaint, Doe 7 was acting under color of state law.

## VENUE AND JURISDICTION

19.     This Court has jurisdiction over the federal claims presented in this action pursuant to 28 U.S.C. §§ 1331, 1343.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because all of the events that support the allegations occurred in this judicial district and because Ms. Beard is incarcerated in this judicial district.

## FACTUAL BACKGROUND

21.     Ms. Beard is a transgender woman.

22.     Ms. Beard was diagnosed with gender dysphoria in 2017 and has been undergoing hormone replacement therapy since approximately December 2018 or January 2019.

23.     Ms. Beard was incarcerated within the Missouri Department of Corrections ("MDOC") system when she was diagnosed with gender dysphoria and when she started her hormone therapy.

24.     Ms. Beard was transferred to JCCC from a different MDOC facility in December 2020.

25.     Ms. Beard has continued to treat for gender dysphoria and receive hormone treatment therapy at JCCC since her transfer to the JCCC facility in December 2020.

6

26.     Ms. Beard presents herself in accordance with her gender identity, and her preferred pronouns are "she/her/hers."

27.     Upon information and belief, at all relevant times, each Defendant had knowledge of Ms. Beard's status as a transgender woman.

28.     During Ms. Beard's incarceration, JCCC officials have repeatedly used offensive and derogatory terms toward Ms. Beard related to her status as a transgender woman and have refused or failed to address Ms. Beard by her preferred pronouns.

29.     At all times relevant to this case, Ms. Beard resided in JCCC's High-Security Unit ("HSU") Unit 8.  HSU Unit 8 is JCCC's most restrictive housing unit and it is for inmates in Administrative Segregation.

## INCIDENT OF MARCH 29 OR 30, 2021

30.     On either March 29th or March 30th, 2021, at approximately 1:21 p.m., Ms. Beard was locked in her cell when she was approached by Defendant Epps.

31.     Epps informed Ms. Beard that he would be taking her to see an "investigator". Upon information and belief, Ms. Beard's appointment with the investigator was related to a Prison Rape Elimination Act ("PREA") violation Ms. Beard previously reported against a JCCC official.

32.     Epps instructed Ms. Beard to submit to being handcuffed while she remained in the cell.  Ms. Beard complied with Epps's instructions.  Epps placed handcuffs on Ms. Beard without incident.

33.     Epps then ordered Ms. Beard out of her cell and into the hallway.  Ms. Beard once again was fully compliant with Epps's instruction.

7

34.     Epps instructed Ms. Beard to lean against a wall to support herself so that he could apply leg restraints on her.  Ms. Beard complied with Epps's instructions.

35.     As Epps began to apply the leg restraints, he noticed that Ms. Beard was wearing a homemade mini skirt and her hair was styled in "pigtails."

36.     Epps began to berate Ms. Beard, calling her offensive names such as "HIV infested fag" and "Dick sucking maneater."

37.     Ms. Beard calmly told Epps, "I am a transgender woman who deserves the same respect as every male or female offender incarcerated."

38.     Epps then told Ms. Beard that he would not take her to see the investigator "looking like that" and instructed her to go back into her cell to change clothes.

39.     Ms. Beard told Epps that she is allowed to express her gender through her appearance.  Not wanting to change clothes, Ms. Beard told Epps she wanted to speak to one of his superior officers.

40.     In response, Epps violently grabbed Ms. Beard—who remained restrained by handcuffs and did nothing to provoke such a violent reaction— by a "leash" connected to the back of her restraints and slammed her on the ground.

41.     Defendants Carignan and Falter rushed over to assist Epps, and all three Defendants held Ms. Beard face-down on the ground.

42.     Epps stuck his knee into Ms. Beard's back while Carignan applied the leg restraints to Ms. Beard's legs.

43.     With Ms. Beard subdued on the ground, Falter dispersed a can of pepper spray directly into Ms. Beard's eyes.

44.     The pepper spray caused Ms. Beard to cough violently and to suffer an intense burning sensation on her eyes and skin.  Ms. Beard was never given any eye solution to wash the pepper spray out, and it continued to burn for 2-3 days.

45.     Defendant Matherly approached with a handheld video camera and recorded the Defendants' unnecessary use of force.  The investigator, who had joined the Defendants, recorded the incident with an audio recording device.

46.     A number of unidentified correctional officers—John Does 1–5—joined Epps, Falter, Carignan, and Matherly and helped carry Ms. Beard inside her cell.

47.     Once inside the cell, Epps, Falter, Carignan, and John Does 1-5—all of whom were male—proceeded to cut Ms. Beard's clothes off of her body.

48.     Ms. Beard protested Defendants' intrusive actions by repeatedly screaming that she is a transgender woman and does not feel comfortable being forcibly stripped naked by, or in front of, male correctional officers.

49.     Under JCCC's policies and procedures, if correctional officers must perform a strip-search of an inmate, that search is normally conducted in a "dress out cell."  Transgender inmates are typically allowed to keep their underwear and bras on during these searches.  Absent exigent circumstances, strip searches are to be conducted by officers of the same gender or identified gender as the inmate.  Searches are typically to be performed without direct touching of the inmate.  No exigent circumstances were present here.  Defendants failed to follow those policies and procedures despite Ms. Beard requesting procedure be followed.

50.     Furthermore, JCCC's policies and procedures dictate that, upon request, inmates who identify as transgender are to be provided privacy from other inmates during strip-searches.

Ms. Beard repeatedly requested that Defendants follow proper procedure. Yet Defendants failed to do so.

51.     Instead, Epps, Falter, Calderon, and John Does 1-5 aggressively cut and removed Ms. Beard's shirt, skirt, bra, and socks, leaving her dressed in nothing but her underwear.

52.     Ms. Beard's breasts were now exposed in front of the all-male Defendants.

53.     There was no legitimate reason for Defendants to strip Ms. Beard to her underwear or to remove her clothes in such an aggressive and humiliating manner.

54.     Other inmates have not been treated in this manner in similar situations.

55.     The Defendants then carried Ms. Beard out of her cell in full view of male offenders. Ms. Beard's hands and legs were restrained, and she was completely naked except for her underwear.

56.     Ms. Beard repeatedly requested a shirt or bra to cover her exposed breasts, but Defendants disregarded her request.

57.     Defendants carried Ms. Beard through the prison hallways, to the "Rubber Room"—a holding area for inmates on suicide watch.

58.     Defendant Graff and another correctional officer, Sergeant Ashley, joined the aforementioned Defendants in the Rubber Room.

59.     Jane Doe 7, a nurse, came in to do an assessment on Ms. Beard. Doe 7 performed a quick evaluation of Ms. Beard's vitals. However, despite Ms. Beard's request, Doe 7 did not take any pictures of her injuries, including the bruising and swelling of her face.

60.     Ms. Beard repeatedly told everyone who entered the Rubber Room, including Epps, Falter, Carignan, Graff, Matherly, and John Does 1–5, that she needed a bra or shirt to cover her exposed breasts. The Defendants continued to disregard that request.

61. Ms. Beard also repeatedly told the Defendants who entered the Rubber Room that she wanted to file a Prison Rape Elimination Act ("PREA") report against the Defendants involved in stripping her naked and exposing her to male correctional officers and inmates. Defendants disregarded that request, as well.

62. Defendants then secured Ms. Beard to a highly restrictive and physically uncomfortable restraining device referred to as "The Wrap."

63. Ms. Beard was left in the Rubber Room secured to the Wrap with her breasts exposed for an unknown length of time. While Ms. Beard was restrained in the wrap, several male correctional officers entered the room and observed Ms. Beard's exposed body.

64. There was no legitimate reason to leave Ms. Beard in The Wrap for an extended period of time.

65. There was no legitimate reason to leave Ms. Beard's breasts exposed.

66. After Ms. Beard spent an undetermined length of time sitting in the Rubber Room, Defendants Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 wheeled Ms. Beard, who remained in The Wrap, out of the Rubber Room and back to a cell.

67. While Ms. Beard was en route to her cell, Sergeant Ashley, placed a T-shirt over Ms. Beard's chest, finally covering her exposed breasts.

68. Because Ms. Beard's cell had lingering residue from the pepper spray discharged by Defendant Falter, Ms. Beard was taken to a nearby cell.

69. Epps, Falter, Carignan, Graff, Matherly, and the John Does took Ms. Beard out of the Wrap, placed her face-down on the floor and proceeded to remove the handcuffs and leg restraints.

70. One of the Defendants threatened Ms. Beard, saying "Don't move, faggot, or we will do you worse next time." Ms. Beard could not identify which Defendant threatened her. None of the Defendants spoke out in Ms. Beard's defense.

71. Ms. Beard was terrified and did not move or speak until Defendants left and closed her cell.

72. During this incident, Epps, Falter, Carignan, Graff, Matherly, and John Does 1–5 repeatedly referred to Ms. Beard by the male pronouns, "he/him/his" despite Ms. Beard informing them of her preferred pronouns.

73. Ms. Beard submitted two PREA violation reports related to this incident, but she never heard back from a PREA investigator.

74. Ms. Beard also never heard back from the PREA investigator regarding her initial PREA complaint.

75. Ms. Beard suffered extreme emotional distress from being aggressively stripped by male correctional officers and paraded in front of male inmates. Ms. Beard had been raped multiple times by her father when she was between the ages of 5–8 years-old, and this incident triggered flashbacks to her past trauma as a victim of sexual violence.

76. In addition to suffering extreme emotional distress, Ms. Beard suffered physical injuries from Defendants' excessive use of force. Ms. Beard had severe bruising and swelling on her face from being slammed to the ground. She was left with pepper spray on her face for an excessive length of time. Ms. Beard also suffered a back injury, which manifested a week after the attack, for which she is still undergoing medical treatment.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

77.     On April 9, 2021, Ms. Beard attempted to address Defendants' excessive use of force and forced display of public nudity by utilizing JCCC's administrative grievance process.

78.     Ms. Beard first submitted an Informal Resolution Request ("IRR").  **See Exhibit 1**.

79.     Defendants Jacki Petri, Todd Matthew, and Jane/John Doe 6 (JCCC's Assistant Warden), prepared a response to the IRR.  **See Exhibit 2**.  The formal response simply stated: "I have reviewed your complaint and information, [and] I find that staff filled out a Cross Gender Search Mo 931-4701.  This issue is moot.  IRR Denied."

80.     The IRR Response failed to address Defendants' excessive use of force, the exposure of her breasts to other inmates, the refusal to cover Ms. Beard's breasts while carrying her down the halls or in the Rubber Room, or failure to use her preferred pronouns.

81.     Ms. Beard appealed the woefully deficient IRR Response by filing an Offender Grievance on April 26, 2021.  **See Exhibit 3.**

82.     The Offender Grievance was answered by a Warden's Response, which was dated May 24, 2021, signed  June 3, 2021, and given to Ms. Beard on June 4, 2021.  **See Exhibit 4.**

83.     The Warden's Response denied Ms. Beard's Grievance.  Specifically, it stated that Ms. Beard received an unrelated conduct violation on March 31, 2021, which was **1-2 days _after_** the incident described above and had no relevance to Ms. Beard's Grievance.  The rest of the Warden's Response also addressed a separate incident on March 30 that occurred **_after_** the incident addressed in Ms. Beard's grievance.  The Warden's Response completely failed to address the incident that formed the basis for Ms. Beard's IRR.

84.     Ms. Beard proceeded to the final step of the administrative grievance process by filing an Offender Grievance Appeal on June 6, 2021.  **See Exhibit 5**

85.     Ms. Beard's Appeal was denied by Defendant Jason Lewis, the Deputy Division Director of the Missouri Department of Corrections' Division of Adult Institutions. **See Exhibit 6.**

86.     Lewis stated that Ms. Beard's "inappropriate actions" resulted in Defendants' use of force. Lewis stated that the Defendants' use of force "was that minimally necessary to control the incident and maintain good order and security."

87.     Lewis's Response did not specifically address Defendants' wrongful conduct: inhibiting Ms. Beard from expressing her right to express her gender, aggressively cutting off Ms. Beard's clothes, carrying her through the prison with her breasts exposed to the male correctional officers and male inmates, or leaving her in the rubber room with her breasts exposed to the male correctional officers that entered. Neither did Lewis explain how these actions constituted the "minimally necessary" use of force to control the incident—an incident which was instigated by Defendant Epps, not Ms. Beard.

88.     During the grievance process, Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis failed to address the incident and complaints at issue, provided no accountability and, essentially, rubberstamped the aforementioned Defendants' treatment of Ms. Beard.

89.     The Offender Grievance Appeal was the final administrative remedy available to Ms. Beard. As such, she has fully exhausted her administrative remedies with regard to the incident on March 29th or 30th, 2021.

## **DEFENDANTS' SUBSEQUENT RETALIATORY CONDUCT**

90.     After exhausting her administrative remedies, Ms. Beard filed this lawsuit on November 3, 2021.

91.     Since utilizing the grievance process and initiating this lawsuit, Ms. Beard has been the victim of ongoing harassment by JCCC officials.

**A.     Adverse Housing Assignment Decision**

92.     A few weeks after filing her lawsuit, Ms. Beard, who was and still is being held in Administrative Segregation, was scheduled for a review hearing to determine whether she would be promoted out of HSU Unit 8 to a more favorable housing assignment.

93.     HSU Unit 8 is JCCC's most restrictive and punitive housing unit, and it is intended for inmates with Major Conduct Violations.  In HSU Unit 8, inmates are denied cellmates, certain personal property, and use of the gym or dining hall.  They are required to be shackled and handcuffed whenever they leave the cell.  The only outdoors time they receive is spent in a tiny cage.

94.     Placement in Administrative Segregation is overseen by a three-member review panel.  The review panel is typically staffed by the inmate's Functional Unit Manager ("FUM"), the inmate's Caseworker, and a Lieutenant level corrections officer.

95.     Defendant Falter—despite being a subject of her grievance and named as a Defendant in this lawsuit for his role in the March 29th or 30th incident—served on the three-member review board that would determine whether Ms. Beard would be promoted out of HSU Unit 8.

96.     The other two members of the Review Board were Mark Leonard and Defendant Scott Kitner.

97.     Since her most recent housing review, Ms. Beard had one Minor Conduct Violation and no Major Conduct Violations.  Accordingly, Ms. Beard should have been eligible to be promoted out of HSU Unit 8.

98.     Before the review hearing, Falter appeared at Ms. Beard's cell by himself and threatened that he would ensure that Ms. Beard stayed in Administrative Segregation for a long time.

99.     Falter followed through with his threat.  Although Ms. Beard had no Major Conduct Violations since her last review hearing, the review board ruled that Ms. Beard would remain in Administrative Segregation, Unit 8, for an additional 90 days, citing her one Minor Conduct Violation in support of this decision.

100.    Upon information and belief, Falter's threat and adverse housing decision was intentional retaliation against Ms. Beard for availing herself of the prison grievance system and for filing this lawsuit.

**B.     Stolen Property**

101.    On December 30, 2021, Ms. Beard was put on suicide watch.  Ms. Beard's personal belongings were taken from her, which is standard practice for inmates on suicide watch.

102.    On January 3, 2022, Ms. Beard was removed from suicide watch.  When Ms. Beard's belongings were returned to her, many items were missing.  The missing items included eyeglasses, legal documents, personal mail, religious material, stamps, personal hygiene items, and photographs.

103.    Ms. Beard's eyeglasses have since been returned to her, but the other personal property remains missing.

104.    Defendants Mauler, Sonne, and Dobbins were responsible for taking and returning Ms. Beard's property.

105.    Upon information and belief, Ms. Beard's property was taken in retaliation against Ms. Beard for exercising her right to utilize the prison grievance process and for filing this lawsuit.

**C.    Denial of Showers and Mental Health Treatment**

106.    On January 5, 2022, Defendants Bade and Dobbins refused to provide Ms. Beard with necessary mental health treatment.

107.    Defendants Falter and Epps have denied Ms. Beard access to showers.

108.    Upon information and belief, Bade, Dobbins, Falter, and Epps denied Ms. Beard these services and amenities to retaliate against Ms. Beard for exercising her right to utilize the prison grievance process and for filing this lawsuit.

**D.    Vandalism to Ms. Beard's Cell and Belongings**

109.    On January 18, 2022, Ms. Beard met with two of the undersigned counsel for approximately three hours.  While Ms. Beard was meeting with her counsel, an unidentified person ransacked Ms. Beard's cell, tearing up her belongings and leaving the cell in disarray.

110.    All of Ms. Beard's mail, including confidential attorney-client mail, was opened and/or destroyed.  Envelopes containing the confidential communications had been conspicuously marked as "confidential" and "attorney-client," yet the contents were removed by the JCCC official(s) and the confidential communications read in direct violation of her right to protect attorney-client privileged communications.

111.    Only JCCC officials would have had access to Ms. Beard's cell.

112.    It is unclear which JCCC official(s) was responsible for the destruction of Ms. Beard's cell.

113.     Upon information and belief, Ms. Beard was targeted by one or more of the named Defendants or John Doe Defendants as retaliation and to intimidate her from pursuing this lawsuit.

**E.     Placed on Suicide Watch and Additional Physical Abuse**

114.      On February 1, 2022, Ms. Beard was approached by JCCC officials to be put on suicide watch.  They requested that she submit to being handcuffed so they could take her out of the cell.

115.     Ms. Beard had not requested to be put on suicide watch, and there was no reason for JCCC officials to place her on suicide watch.

116.     Because Ms. Beard had not requested to be put on suicide watch, she refused to leave her cell.  The JCCC officials then pepper sprayed Ms. Beard twice.

117.     Ms. Beard then told the officials that she would comply with their orders.

118.     However, instead of allowing Ms. Beard to voluntarily go to suicide watch, the officials called in an extraction team of five men wearing motorcycle helmets.  Defendants Graff and Atchison were present, but the other three correctional officers were unidentifiable.

119.     The extraction team took Ms. Beard to the "Rubber Room" but it was unclear why she was placed there.

120.     Ms. Beard started yelling and making noise to get the attention of an official.

121.     An official came to the door and pepper sprayed Ms. Beard.

122.     Ordinarily, pepper spray is not used against an inmate for making noise.

123.     Prior to the use of pepper spray, officials must give a verbal directive to stop a behavior and a warning that pepper spray will be used.  No warning was given.

124.     Ms. Beard was left in the Rubber Room with pepper spray residue for approximately two and a half days, without being afforded a shower or other mechanism to wash the residue off.

**F.     Denied Access to Administrative Grievance Process**

125.     Ms. Beard made repeated attempts to utilize the JCCC's administrative grievance process to address Defendants' retaliatory actions discussed above.

126.     The first step in the Administrative Grievance process is to file an IRR and the IRR forms are obtained from an Inmate's Caseworker.

127.     Ms. Beard had two caseworkers during this time, Defendants Scott Kitner and Jacki Petri.

128.     Ms. Beard requested that Kitner and Petri provide an IRR form following each of the incidents described above so that she could address the retaliatory conduct through the administrative grievance process.  Kitner and Petri failed or refused to provide Ms. Beard with an IRR Form.

129.     As such, Kitner and Petri prevented Ms. Beard from addressing these incidents through JCCC's administrative grievance process.

130.     Additionally, Ms. Beard was scheduled to see an investigator regarding a PREA violation immediately before the incident on March 29-30, 2021.  Instead of meeting with the investigator, Ms. Beard was beaten, pepper-sprayed, stripped, and held in the Rubber Room. Ms. Beard never had the opportunity to meet with the PREA investigator on March 29-30, 2021, and no follow-up interview was ever scheduled.

131.    Finally, during the subject incident Ms. Beard requested to report a PREA violation relating to the Defendants' improper actions.  None of the Defendants involved acknowledged her request or provided her the form necessary to submit the PREA violation.

## COUNT I – EIGHTH AMENDMENT VIOLATION
### (42 U.S.C. § 1983)
**(Defendants Epps, Falter, Carignan, Graff, Matherly, John Does 1-5, Bade, Dobbins, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis)**

132.    Ms. Beard incorporates and re-alleges by reference the allegations of the previous paragraphs of the Amended Complaint.

133.    The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, including uses of force that are excessive under the circumstances and constitute the unnecessary and wanton infliction of pain.  The core consideration is whether the use of force was exercised in a good-faith effort to restore order or was applied maliciously and sadistically.

134.    Defendant Epps violated Ms. Beard's clearly established constitutional right to be free from cruel and unusual punishment by slamming Ms. Beard on her face, placing his knee in her back, aggressively cutting Ms. Beard's clothes off her body, refusing to give her a covering for her breasts, and carrying her—breasts exposed—through the prison in view of male officers and male inmates.

135.    Defendant Carignan violated Ms. Beard's clearly established constitutional right to be free from cruel and unusual punishment by assisting Epps in holding Ms. Beard to the ground, aggressively cutting Ms. Beard's clothes off her body, refusing to give her a covering for her breasts, and carrying her—breasts exposed—through the prison in view of male officers and male inmates.

136. Defendant Falter violated Ms. Beard's clearly established constitutional right to be free from cruel and unusual punishment by assisting Epps in holding Ms. Beard to the ground, discharging pepper spray in her face, aggressively cutting Ms. Beard's clothes off her body, refusing to give her a covering for her breasts, and carrying her—breasts exposed—through the prison in view of male officers and male inmates.

137. Defendants John Does 1-5 violated Ms. Beard's clearly established constitutional right to be free from cruel and unusual punishment by assisting Epps, Carignan, and Falter in holding down Ms. Beard, aggressively cutting Ms. Beard's clothes off her body, refusing to give her a covering for her breasts, and carrying her—breasts exposed—through the prison in view of male officers and male inmates.

138. Defendant Graff violated Ms. Beard's clearly established constitutional right to be free from cruel and unusual punishment by refusing to give her a covering for her breasts.

139. Matherly violated Ms. Beard's clearly established constitutional right to be free from cruel and unusual punishment by refusing to give her a covering for her breasts.

140. Defendants' use of force was excessive under the circumstances. Ms. Beard was not violating any prison rules and was not acting disruptively.

141. Defendants could not have reasonably perceived that Ms. Beard posed a threat to Defendants or any third parties' safety. Ms. Beard was fully restrained and handcuffed during the entire interaction.

142. Use of force was not needed to restore order or security, as Ms. Beard was calm and complying with Epps's instruction. The instigating event was Ms. Beard's request to speak with Epps's superior officer. This request did not justify Epps's immediate and excessive use of force.

143.   Defendants made no effort to minimize their use of force.  Rather, Defendants escalated their use of force to a completely unreasonable degree.

144.   Defendants further violated the Eighth Amendment by denying Ms. Beard medical care.  Ms. Beard has been diagnosed with gender dysphoria, and each Defendant was aware of her diagnosis.  By failing to use Ms. Beard's proper pronouns and preventing her from wearing clothes that align with her gender identity, Defendants have interfered with Ms. Beard's ability to fully adopt her gender identity.

145.   Defendants Bade and Dobbins denied Ms. Beard access to medical care when they refused to take her to her necessary mental health treatment.

146.   Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis personally participated in the violation of Ms. Beard's Eighth Amendment rights by failing to address the incident that formed the basis of Ms. Beard's IRR and by rubberstamping the conduct of Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 during the administrative grievance process.

147.   Defendant Falkenrath, as Warden of JCCC, contributed to the violation of Ms. Beard's Eighth Amendment rights by failing to adequately train and supervise Epps, Falter Carignan, Graff, Matherly, and John Does 1-5 regarding proper use of force or treatment of transgender inmates, by failing to take corrective action upon learning of the Eighth Amendment violation, and by failing to implement meaningful policies and procedures to safeguard against such violations.

148.   As a transgender woman in an all-male prison, Ms. Beard is a member of a vulnerable class of inmates.  Defendants Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 were deliberately indifferent to Ms. Beard's vulnerability and placed her in harm's way when

they prevented her from wearing clothes that conform to her gender identity, refused to refer to her by her preferred pronouns, stripped her clothes, and forced her to be displayed topless in front of male inmates.

149.    Defendants Bade and Dobbins were deliberately indifferent to Ms. Beard's vulnerability as a transgender woman and placed her in harm's way when they refused to take her to her mental health treatment.

150.    Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis were deliberately indifferent to Ms. Beard's vulnerability as a transgender woman and placed her in harm's way when they failed to take protective measures and rubber-stamped the conduct of Defendants Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5.

151.    Defendants knew that their conduct violated JCCC's policies, was unlawful, and violated Ms. Beard's constitutional rights.

152.    Defendants' conduct was intentional, willful and reckless.

153.    Defendants' actions caused Ms. Beard to suffer physical injury, pain and suffering, loss of enjoyment of life, and severe emotional distress.

### COUNT II – FOURTH AMENDMENT VIOLATION
#### (42 U.S.C. § 1983)
#### (Defendants Epps, Falter, Carignan, Graff, Matherly, John Does 1-5, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis)

154.    Ms. Beard incorporates and re-alleges by reference the allegations in the previous paragraphs of the Amended Complaint.

155.    Ms. Beard has a Fourth Amendment right to be free from unreasonable searches.

156.    Ms. Beard's Fourth Amendment right was violated by Defendants Epps, Falter Carignan, Graff, and John Does 1-5 when they aggressively strip-searched Ms. Beard by cutting off all of her clothes.

157.     The strip-search was unreasonable under the circumstances because Defendants

lacked a legitimate need to strip-search Ms. Beard, who did not pose a threat to the Defendants

or institutional control.  No exigent circumstances or penological purpose justified the strip-

search.

158.     The strip-search was also performed in a unreasonable manner: the search was

performed by male correctional officers and Defendants never checked if a female officer was

available to conduct the search, the search involved unnecessary offensive touching, and the

Defendants made no attempt to limit the intrusive nature of the search but instead performed it in

a degrading, humiliating, and abusive manner.

159.     There were no exigent circumstances or penological purpose that would justify

Defendants keeping Ms. Beard undressed with her breasts exposed while Defendants carried her

through the prison in view of male inmates to the Rubber Room.

160.     There were no exigent circumstances or penological purpose that would justify

leaving Ms. Beard undressed with her breasts exposed while she sat in the Rubber Room.

161.     Under the circumstances, Defendants' unreasonable search was not in pursuit of a

legitimate penological interest.  Rather, it was motivated by malice and for the purpose of

harassing Ms. Beard.

162.     Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis personally

participated in the violation of Ms. Beard's Fourth Amendment rights by rubberstamping the

Defendants conduct during the administrative grievance process.

163.     Defendant Falkenrath, as Warden of JCCC, personally participated in the

violation of Ms. Beard's Fourth Amendment rights by failing to adequately train and supervise

Epps, Falter Carignan, and John Does 1-5 regarding proper search procedures, by failing to take

24

corrective action upon learning of the Fourth Amendment violation, and by failing to implement meaningful policies and procedures to safeguard against such violations.

164.     As a transgender woman in an all-male prison, Ms. Beard is a member of a vulnerable class of inmates.  Defendants Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 were deliberately indifferent to Ms. Beard's vulnerability and placed her in harm's way when they prevented her from wearing clothes that conform to her gender identity, refused to refer to her by her preferred pronouns, forcibly cut her clothes from her body, and forced her to be displayed topless in front of male inmates.

165.     Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis were deliberately indifferent to Ms. Beard's vulnerability as a transgender woman and placed her in harm's way when they failed to take protective measures and rubber-stamped the conduct of Defendants Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5.

166.     Defendants knew that their conduct violated JCCC's policies, was unlawful, and violated Ms. Beard's constitutional rights.

167.     Defendants' conduct was intentional, willful and reckless.

168.     Defendants' actions caused Ms. Beard to suffer physical injury, pain and suffering, loss of enjoyment of life, and severe emotional distress.

### COUNT III – FOURTEENTH AMENDMENT EQUAL PROTECTION VIOLATION (42 U.S.C. § 1983) (Defendants Epps, Falter, Carignan, Graff, Matherly, John Does 1-5, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis)

169.     Ms. Beard incorporates and re-alleges by reference the allegations in the previous paragraphs of the Amended Complaint.

170. As a transgender woman in an all-male prison, Ms. Beard is a member of a vulnerable class of inmates.

171. At a minimum, the Equal Protection Clause prohibits JCCC officials from intentionally treating Ms. Beard differently from similarly situated inmates without a rational basis related to a legitimate penological purpose.

172. Further, because Ms. Beard belongs to a protected class, Defendants must show more than a mere rational basis for their conduct.

173. Defendants Epps, Falter, Carignan, Graff, Matherly, John Does 1-5 violated Ms. Beard's equal protection rights when they prevented her from wearing clothes that conform to her gender identity, refused to refer to her by her preferred pronouns, subjected her to unnecessary force, stripped her clothes, and forced her to be displayed topless in front of male inmates—all conduct that similarly situated inmates are not subjected to.

174. Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis personally participated in the violation of Ms. Beard's Fourteenth Amendment rights by failing to address the Defendants' actions during the incident at issue and rubberstamping the Defendants' conduct during the administrative grievance process.

175. Defendant Falkenrath, as Warden of JCCC, personally participated in the violation of Ms. Beard's Fourteenth Amendment rights by failing to adequately train and supervise Epps, Falter, Carignan, Graff, Matherly, John Does 1-5 regarding non-discriminatory treatment of transgender inmates, by failing to take corrective action upon learning of the Fourteenth Amendment violation, and by failing to implement meaningful policies and procedures to safeguard against such violations.

176. Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis were deliberately indifferent to Ms. Beard's vulnerability as a transgender woman and placed her in harm's way when they failed to take protective measures and rubber-stamped the conduct of Defendant Epps's conduct.

177. Defendants had no rational basis related to a legitimate penological purpose which would justify their intentionally treating Ms. Beard differently than other transgender inmates.

178. Defendants knew that their conduct violated JCCC's policies, was unlawful, and violated Ms. Beard's constitutional rights.

179. Defendants' conduct was intentional, willful and reckless.

180. In addition to infringing upon Ms. Beard's Fourteenth Amendment rights Defendants' actions caused Ms. Beard to suffer physical injury, pain and suffering, loss of enjoyment of life and severe emotional distress.

<u>**COUNT IV – FIRST AMENDMENT VIOLATION**</u>
<u>**(42 U.S.C. § 1983)**</u>
**(Defendants Epps, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis)**

181. Ms. Beard incorporates and re-alleges by reference the allegations in the previous paragraphs of the Amended Complaint.

182. The First Amendment of the United States Constitution protects Ms. Beard's right to express herself as a woman through her chosen clothing.

183. In the prison context, inmates retain all First Amendment rights that are not inconsistent with their status as a prisoner or with the legitimate penological interests of the prison

27

184.    Defendant Epps infringed upon Ms. Beard's First Amendment rights when he refused to take Ms. Beard to see the PREA investigator without Ms. Beard first changing her clothes.

185.    There was no legitimate penological reason for Epps to refuse to take Ms. Beard to see the PREA investigator in her chosen clothes.

186.    Defendant Falkenrath, as Warden of JCCC, personally participated in the violation of Ms. Beard's First Amendment rights by failing to adequately train and supervise Epps regarding treatment of Transgender inmates, by failing to take corrective action upon learning of the First Amendment violation, and by failing to implement meaningful policies and procedures to safeguard against such violations.

187.    As a transgender woman in an all-male prison, Ms. Beard is a member of a vulnerable class of inmates. Defendant Epps was deliberately indifferent to Ms. Beard's vulnerability and placed her in harm's way when he prevented her from wearing clothes that conform to her gender identity, refused to refer to her by her preferred pronouns, stripped her clothes, forced her to be displayed topless in front of male inmates.

188.    Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis were deliberately indifferent to Ms. Beard's vulnerability as a transgender woman and placed her in harm's way when they failed to take protective measures, failed to address the Defendants' actions during the incident at issue, and rubber-stamped the conduct of Defendants Epps's conduct during the administrative grievance process.

189.    Defendants knew that their conduct violated JCCC's policies, was unlawful, and violated Ms. Beard's constitutional rights.

190.    Defendants' conduct was intentional, willful and reckless.

191.     In addition to infringing upon Ms. Beard's First Amendment rights Defendants' actions caused Ms. Beard to suffer loss of enjoyment of life and severe emotional distress.

## COUNT V – FIRST AMENDMENT VIOLATION
### (42 U.S.C. § 1983)
### (Defendants Kitner and Petri)

192.     Ms. Beard incorporates and re-alleges by reference the allegations in the previous paragraphs of the Amended Complaint.

193.     The First Amendment of the United States Constitution protects Ms. Beard's right to utilize JCCC's administrative grievance process.

194.     Defendants Kitner and Petri violated that right when they repeatedly refused to provide Ms. Beard with an IRR form.

195.     There was no legitimate penological reason for Kitner and Petri to refuse to provide Ms. Beard with IRR forms.

196.     Defendants knew that their conduct violated JCCC's policies, was unlawful, and violated Ms. Beard's constitutional rights.

197.     Defendants' conduct was intentional, willful and reckless.

198.     In addition to infringing upon Ms. Beard's First Amendment rights, Kitner and Petri's actions caused Ms. Beard to suffer loss of enjoyment of life and severe emotional distress.

## COUNT VI – FIRST AMENDMENT RETALIATION
### (42 U.S.C. § 1983)
### (Defendants Epps, Falter, Dobbins, Sonne, Bade, John Doe's 1-5, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis)

199.     Ms. Beard incorporates and re-alleges by reference the allegations in the previous paragraphs of the Amended Complaint.

200.     Ms. Beard engaged in protected First Amendment activity when she filed her grievances and this lawsuit.

201.    Ms. Beard engaged in protected First Amendment activity by presenting herself in clothing that is in alignment with her identity as a transgender woman.

202.    Since Ms. Beard utilized the grievance process and filed her lawsuit, Defendants have taken a series of retaliatory adverse actions against Ms. Beard.  Specifically, Ms. Beard has been forced to remain in Administrative Segregation in JCCC's most restrictive housing unit; she has been threatened to be transferred to another prison; she has been denied mental health treatment and access to a shower; she has had her personal belongings taken and her cell ransacked, she has had her confidential attorney-client communications read, legal and other mail destroyed, and she was forced to go on suicide watch.

203.    Defendants' violation of protected attorney-client privilege and adverse actions would chill a person of ordinary firmness from continuing in her protected First Amendment activity.

204.    Defendants cannot demonstrate these adverse actions would be justified regardless of Ms. Beard's protected First Amendment activity.

205.    Defendants' adverse actions are motivated, at least in part, by Ms. Beard's protected First Amendment activity.

206.    Defendants knew that their conduct violated JCCC's policies, was unlawful, and violated Ms. Beard's constitutional rights.

207.    Defendants' conduct was intentional, willful and reckless.

208.    As a result of Defendant's retaliatory and harassing conduct, Ms. Beard's First Amendment rights are under assault, causing her severe emotion distress.  She is also concerned that continuing to exercise her First Amendment rights will result in physical harm and other

retaliatory punishment, including loss of privileges, loss of property, loss of access to mental health treatment, and/or a retaliatory transfer to an undesirable prison.

209.    Defendants' retaliatory and harassing conduct is ongoing and pervasive.

## COUNT VII – ASSAULT AND BATTERY
### (Missouri State Law)

**(Defendants Epps, Falter, Carignan, John Does 1-5, Petri,
Matthew, Jane/John Doe 6, Falkenrath, and Lewis)**

210.    Ms. Beard incorporates and re-alleges by reference the allegations in the previous paragraphs of the Amended Complaint.

211.    On March 29 or 30, 2021, Defendants Epps, Falter, Carignan, and John Does 1-5 demonstrated an intent to cause bodily harm or offensive contact, or an apprehension of either, on Ms. Beard.

212.    Defendants also intentionally initiated an offensive bodily contact with Ms. Beard.

213.    Specifically, Defendants grabbed Ms. Beard by her restraints, slammed her on the ground, stuck a knee into her back, discharged a can of pepper spray in her face, referred to her by many derogatory and offensive names, and aggressively cut off her clothes.

214.    Defendants actions were done with malice and bad faith.

215.    Defendants were acting in their ministerial capacity.

216.    Ms. Beard did not consent to any contact by Defendants.

217.    As a transgender woman in an all-male prison, Ms. Beard is a member of a vulnerable class of inmates.  Defendants Epps, Falter, Carignan, and John Does 1-5 were deliberately indifferent to Ms. Beard's vulnerability and placed her in harm's way when they prevented her from wearing clothes that conform to her gender identity, refused to refer to her by

her preferred pronouns, stripped her clothes, forced her to be displayed topless in front of male inmates.

218.    Defendants Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis were deliberately indifferent to Ms. Beard's vulnerability as a transgender woman and placed her in harm's way when they failed to take protective measures and rubber-stamped the conduct of Defendants Epps's conduct.

219.    Defendants' conduct was intentional, willful and reckless.

220.    Defendants' actions caused Ms. Beard to suffer physical injury, pain and suffering, loss of enjoyment of life, and severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays that this court enter Judgment as follows:

1.    A declaration that the acts and omissions described herein violated Ms. Beard's rights under the Constitution and laws of the United States;

2.    A permanent injunction ordering Defendants to cease their physical violence, threats, and retaliatory conduct toward Ms. Beard;

3.    An injunction ordering JCCC to transfer Ms. Beard to a women's prison for the remainder of her sentence or, alternatively, to transfer Ms. Beard to another correctional facility.

4.    An injunction requiring Defendants to undergo sensitivity training focused on treatment of LGBTI inmates.

5.    Compensatory damages for Ms. Beard's personal injuries, physical pain and suffering and emotional distress against each Defendant in their individual capacity in an amount to be determined at trial.

6.    Punitive damages against each Defendant in an amount to be determined at trial.

7.    An award of attorney's fees, costs, and prejudgment and post judgment interest.

8.  Other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff Sease Beard requests a jury trial on all issues so triable

ARMSTRONG TEASDALE LLP

By: /s/ *Karrie J. Clinkinbeard*

Karrie J. Clinkinbeard        #51413
Megan J. Ochs                #54637
Nicholas D. Slovikoski        #73019
Skyler D. Davenport           #70017
Zachary S. Beach              #73620
2345 Grand Boulevard, Suite 1500
Kansas City, Missouri 64108-2617
Telephone: 816.221.3420
Fax: 816.221.0786
kclinkinbeard@atllp.com
mochs@atllp.com
nslovikoski@atllp.com
sdavenport@atllp.com
zbeach@atllp.com

ATTORNEYS FOR PLAINTIFF SEASE
BEARD