# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| SEASE BEARD, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 21-CV-04211-SRB |
| DORIS FALKENRATH, et al., | ) ) ) |
| Defendants. | ) |

## **ORDER**

Before the Court is Defendants Doris Falkenrath, Nathan Falter, Carignan, Jeremy Epps, Matherly, Graff, Jacki Petri, Todd Matthew, Jason Lewis, Mauler, Sonne, Dobbins, Bade, and Scott Kitner's (collectively, "Defendants") Partial Motion to Dismiss.[1] (Doc. #41.) For the reasons stated below, the motion is DENIED.

## I.  BACKGROUND

Plaintiff Sease Beard ("Plaintiff") is a transgender woman currently incarcerated at Jefferson City Correctional Center ("JCCC") operated by the Missouri Department of Corrections. Defendant Doris Falkenrath ("Falkenrath") is the Warden of JCCC. Defendant Jason Lewis ("Lewis") is the Deputy Division Director of the Missouri Department of Corrections' Division of Adult Institutions. Defendant Todd Matthew ("Matthew") is a JCCC Function Unit Manager. Defendants Nathan Falter ("Falter"), Jeremy Epps ("Epps"), Carignan, Matherly, Graff, Mauler, Sonne, Dobbins, and Bade are JCCC correctional officers. Defendants Jacki Petri ("Petri") and Scott Kitner ("Kitner") are JCCC caseworkers. Plaintiff also names

---

[1] The First Amended Complaint fails to provide a first name for Defendants Carignan, Matherly, Graff, Sonne, Dobbins, or Bade. Further, Defendants refer to Mauler as "Austin Mauller," Todd Matthew as "Todd," Scott Kitner as "Kintner," and Sonne as "Sanni" in the instant motion. The Court will refer to Defendants as they are named in the First Amended Complaint.

"John Does 1-5," who are unnamed correctional officers, "Jane/John Doe 6," Assistant Warden of JCCC, and "Jane Doe 7," a medical professional at JCCC. Each defendant is sued in his or her official and individual capacities. A summary of the facts taken from Plaintiff's First Amended Complaint ("FAC") are below.

In 2017, during Plaintiff's incarceration in the Missouri Department of Corrections system, Plaintiff was diagnosed with gender dysphoria and began hormone replacement therapy in approximately December 2018. In December 2020, Plaintiff was transferred to JCCC, where she is currently located. She continues to be treated for gender dysphoria and receive hormone therapy.

### A. The March 2021 Incident

On either March 29 or March 30, 2021, Epps approached Plaintiff while she was locked in her cell. Epps informed Plaintiff that he was taking her to see an investigator regarding a Prison Rape Elimination Act ("PREA") violation, which Plaintiff had previously reported against a JCCC official. Complying with Epps's instructions, Plaintiff stepped outside of her cell so she could be restrained. When Epps started to apply leg restraints, he noticed Plaintiff was wearing a miniskirt and her hair was styled in "pigtails." (Doc. #19, ¶ 35.) Epps berated Plaintiff and called her offensive names. (Doc. #19, ¶ 36.) Plaintiff calmly informed Epps that she is a transgender woman who deserves the same respect as every male and female inmate.

Epps told Plaintiff he would not take her to see the investigator unless she changed her clothes. Plaintiff refused, explaining to Epps that she is allowed to express her gender through her appearance and that she wanted to speak to one of Epps's superior officers. In response, Epps grabbed Plaintiff by a "leash" connected to the back of her restraints and slammed her on the ground. (Doc. #19, ¶ 40.) Nearby, Carignan and Falter rushed over to assist Epps. Epps

stuck his knee into Plaintiff's back while Carignan finished applying the leg restraints. While Plaintiff was subdued on the ground, Falter pepper sprayed Plaintiff. The pepper spray caused Plaintiff to cough violently and suffer a burning sensation on her eyes and skin. Plaintiff was never given an eye solution to wash out the pepper spray and the burning lasted for two to three days.

Matherly and John Does 1-5 then joined Epps, Falter, Carignan, and Matherly to help carry Plaintiff back inside her cell. The all-male correctional officers then proceeded to cut Plaintiff's clothes off her body. Plaintiff protested and repeatedly screamed that she is a transgender woman and does not feel comfortable being forcibly stripped naked by, or in front of, male correctional officers.

The correctional officers carried Plaintiff out of her cell in full view of male inmates. Plaintiff requested a shirt or bra to cover her breasts, but the correctional officers ignored her. Plaintiff was carried to the "Rubber Room" – a holding area for inmates on suicide watch. (Doc. #19, ¶ 57.) Graff and Sergeant Ashley, another correctional officer not named in this lawsuit, met Plaintiff and the other correctional officers in the Rubber Room. Jane Doe 7 then arrived and assessed Plaintiff's health. Despite Plaintiff's request, Jane Doe 7 did not take pictures of Plaintiff's injuries, including the bruising and swelling on her face. Plaintiff continued to request something to cover herself with, but that request was ignored. The defendants in the room also repeatedly disregarded Plaintiff's request to file a PREA report against the correctional officers who stripped her.

The correctional officers then secured Plaintiff to a highly restrictive and physically uncomfortable restraining device referred to as "the Wrap." (Doc. #19, ¶ 62.) Plaintiff was left secured to the Wrap with her breasts exposed. While restrained in the Rubber Room, several

male correctional officers entered the room and observed her exposed body. After some time, Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 wheeled Plaintiff out of the Rubber Room and to a cell next to hers. Sergeant Ashley eventually gave Plaintiff a shirt to cover her chest.

At the cell, Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 took Plaintiff out of the Wrap, placed her face-down on the floor and proceeded to remove her handcuffs and leg restraints. One of the defendants threatened that if she moved, they would do something worse next time. Plaintiff did not move or speak until the correctional officers left her cell. During the incident, Epps, Falter, Carignan, Graff, Matherly, and John Does 1-5 repeatedly referred to Plaintiff as "he/him/his," despite Plaintiff informing them of her preferred pronouns of "she/her/hers." (Doc. #19, ¶ 72.)

Under JCCC's policies and procedures, if a correctional officer must perform a strip-search of an inmate, that search is normally conducted in a "dress out cell." (Doc. #19, ¶ 49.) Transgender inmates are typically allowed to keep their underwear on during these searches. Absent exigent circumstances, strip searches are conducted by officers of the same gender as the inmate. Searches are done without touching. Transgender inmates, upon request, are provided privacy from other inmates during strip-searches. Defendants did not follow these policies and procedures, despite Plaintiff's repeated requests to do so.

Plaintiff filed two PREA violation reports related to the March 2021 incident, but never heard back from a PREA investigator. Plaintiff attempted to address the incident through JCCC's administrative grievance process. She first submitted an Informal Resolution Request ("IRR"). Petri, Matthew, and Jane/John Doe 6, who is the Assistant Warden, denied the IRR. Plaintiff then filed an Offender Grievance to appeal that denial. The Offender Grievance was

denied by a Warden's Response on the grounds that Plaintiff had received a violation after the March 2021 incident.  The Warden's Response otherwise failed to address the substance of Plaintiff's grievance.  Plaintiff filed another Offender Grievance, which Lewis reviewed and summarily denied based on a finding that the use of force was necessary.  During the grievance process, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis failed to address or otherwise take corrective actions.  Plaintiff then filed this lawsuit on November 3, 2021.

### B. Subsequent Retaliatory Conduct

During the grievance process and this litigation, Plaintiff alleges that Defendants have engaged in retaliatory conduct against her.  For example, JCCC housing placement is reviewed by a three-member review panel.  Plaintiff was scheduled for a review hearing to determine whether she would be promoted out of Administrative Segregation to a more favorable housing assignment.  Plaintiff's review panel consisted of Falter and Kitner, despite them being named in Plaintiff's grievance and as defendants in this lawsuit.  Prior to her hearing, Falter told Plaintiff that he would ensure she would stay in Administrative Segregation.  Plaintiff alleges she was eligible for a housing promotion, but the review panel ruled that Plaintiff would remain in Administrative Segregation for an additional ninety days.

On December 30, 2021, Plaintiff was placed on suicide watch.  As part of standard practice, Plaintiff's personal belongings were taken from her.  On January 3, 2022, Plaintiff was removed from suicide watch, but many of her items were not returned to her.  Plaintiff alleges that Mauler, Sonne, and Dobbins were responsible for taking and returning Plaintiff's property.  Plaintiff also alleges that Bade and Dobbins have refused to provide Plaintiff with necessary mental health treatment, and Falter and Epps have denied Plaintiff access to showers.

On January 18, 2022, Plaintiff met with her counsel about this case. During that meeting, Plaintiff's cell was ransacked and vandalized by JCCC officials. All of Plaintiff's mail was opened or destroyed, including confidential communications between her and her counsel. On February 1, 2022, Plaintiff was again put on suicide watch for no reason. When approached by JCCC officials to remove her from her cell, she refused. She was then pepper sprayed twice. Five men wearing motorcycle helmets, including Graff, removed her from her cell and placed Plaintiff in the Rubber Room. Plaintiff started yelling to get the attention of an official. An official entered the room and again pepper sprayed her. Plaintiff was left in the Rubber Room with pepper spray residue on her for two and a half days.

Plaintiff made repeated attempts to utilize JCCC's administrative process to address these retaliatory actions. However, her caseworkers, Kitner and Petri, failed to provide her with IRR forms and PREA violation forms.

On February 7, 2022, Plaintiff filed her FAC in this lawsuit. Plaintiff asserts the following causes of action under 42 U.S.C. § 1983: Eight Amendment Violation against Epps, Falter, Carignan, Graff, Matherly, John Does 1-5, Bade, Dobbins, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis (Count I); Fourth Amendment Violation against Epps, Falter, Carignan, Graff, Matherly, John Does 1-5, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis (Count II); Fourteenth Amendment Equal Protection Violation against Epps, Falter, Carignan, Graff, Matherly, John Does 1-5, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis (Count III); First Amendment Violation against Epps, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis (Count IV); First Amendment Violation against Kitner and Petri (Count V); and First Amendment Retaliation against Epps, Falter, Dobbins, Sonne, Bade, Mauler,[2] John Doe's 1-5,

---

[2] As explained below, while Mauler is not mentioned in the Count VI caption, the Court construes Count VI as being asserted against Mauler.

Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis (Count VI). Plaintiff also asserts under Missouri state law an assault and battery cause of action against Epps, Falter, Carignan, John Does 1-5, Petri, Matthew, Jane/John Doe 6, Falkenrath, and Lewis (Count VII).

Defendants now move for partial dismissal of this case under Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposes the motion. The parties' arguments are addressed below.

## II. LEGAL STANDARD

Rule 12(b)(6) provides that a defendant may move to dismiss for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ash v. Anderson Merchs., LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

Defendants argue that the Court should dismiss (1) all claims against Mauler because Plaintiff fails to assert a claim against him; (2) Count V against Petri and Kitner; (3) Count I against Bade and Dobbins; (4) Counts I, II, III, IV, and VII against Lewis, Falkenrath, Petri, and Matthew; (5) Count II, III, IV, and VI entirely. The arguments are addressed in the order presented.

### A. Claims Against Mauler

Defendants argues that Plaintiff has failed to assert a claim against Mauler because Mauler is not mentioned in any introductory headers preceding the count-specific allegations. Defendants also argue that the FAC does not provide factual allegations to support a constitutional violation by Mauler. The Court agrees with Plaintiff that the FAC adequately asserts Count VI (First Amendment Retaliation) against Mauler.

Plaintiff alleges that Mauler, in part, was responsible for taking and returning property to Plaintiff after she was unnecessarily placed on suicide watch. Some of Plaintiff's property was not returned to her in retaliation of Plaintiff exercising her right to utilize the prison grievance process and file this lawsuit. These allegations were "incorporate[d] and re-allege[d]" in Count VI. (Doc. #19, ¶ 199.) Plaintiff alleges the stolen property under Count VI is an example of retaliation, and generally refers to "Defendants." (Doc. #19, ¶ 202.) The Court finds these allegations sufficient to put Mauler on notice that Count VI is asserted against him.

Defendants also argue that "[i]f [Plaintiff] meant to assert Count VI against Mauler . . . the claim should be dismissed as argued in part VI." (Doc. # 42, p. 6.)[3] The Court finds Defendants' argument further supports the finding that the FAC "gives [Defendants] fair notice" that Count VI asserts a claim against Defendant Mauler, and the Court will interpret the FAC accordingly. *Johnson v. Precythe*, 954 F.3d 1098, 1101 (8th Cir. 2020) (citation and quotations omitted). The Court will address the remainder of Defendants' Count VI arguments, including the sufficiency of Plaintiff's allegations against Mauler, when addressing Count VI below.

---

[3] Page numbers refer to pagination automatically generated by ECF.

### B. Count V against Kitner and Petri

Count V asserts that Kitner and Petri violated Plaintiff's First Amendment rights by refusing to provide Plaintiff with IRR forms to address the retaliatory conduct she experienced after filing this lawsuit. Defendants first argue Count V should be dismissed because Plaintiff "does not allege that [Kitner] or Petri prohibited her filing a grievance altogether." (Doc. #42, p. 7.) The Court disagrees. The Eight Circuit has long "recognized the First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures." *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994). Plaintiff alleges that "Kitner and Petri failed or refused to provide Ms. Beard with an IRR Form." (Doc. #19, ¶ 128.) While Plaintiff was able to file an IRR form after the March 2021 incident, Plaintiff alleges Kitner and Petri prevented her from addressing subsequent retaliatory conduct through the prison grievance process. Count V adequately states a claim.

Defendants also argue that Count V should be dismissed because Plaintiff experienced no "actual injury" because she was able to file this lawsuit. (Doc. #42, p. 4.) Plaintiff disagrees, arguing that she "has suffered actual injury . . . by [Kitner] and Petri as they have hindered her efforts to pursue a legal claim." (Doc. #53, p. 4.) The Court agrees with Plaintiff. When conduct "strikes at the heart of an inmate's constitutional right to seek redress of grievances, the injury to this right inheres in the retaliatory conduct itself." *Dixon*, 38 F.3d at 379.

Here, Plaintiff alleges that Kitner and Petri "prevented [Plaintiff] from addressing [the retaliatory conduct] through JCCC's administrative grievance process." (Doc. #19, ¶ 129.) This deprivation of Plaintiff's First Amendment right to the grievance process is itself an actual injury. The Court also agrees with Plaintiff that by "failing to provide forms for [Plaintiff] to begin the administrative process certain hindrances arise, such as unavailability of witnesses,

evidence, documentation, and exhaustion of remedies that serve as the foundation of future lawsuits." (Doc. #53, p. 4.) In turn, Plaintiff adequately alleges an actual injury under Count V.

### C. Count I against Bade and Dobbins

Plaintiff alleges in Count I that Defendants violated her Eighth Amendment rights, including Bade and Dobbins refusing to take Plaintiff to her necessary mental health treatment. Defendants argue that Count I against Bade and Dobbins should be dismissed because they are entitled to qualified immunity.

"Qualified immunity shields state officials from both civil liability and the burdens of litigation unless their conduct violates a clearly established right of which a reasonable person would have known." *Patterson v. Kelley*, 902 F.3d 845, 851 (8th Cir. 2018). "[D]efendants seeking dismissal under Rule 12(b)(6) based on an assertion of qualified immunity must show that they are entitled to qualified immunity on the face of the complaint." *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (citations and quotations omitted). "To determine whether a public official is entitled to immunity, courts conduct a two-pronged analysis: whether the plaintiff has stated a plausible claim for violation of a constitutional or statutory right and whether the right was clearly established at the time of the alleged infraction." *Kulkay*, 847 F.3d at 642.

Defendants first argue that the FAC does not sufficiently allege that Bade and Dobbins were deliberately indifferent to a known, serious medical need of Plaintiff. "[D]eliberate indifference to the serious medical needs of a prisoner constitutes cruel and unusual punishment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)). "A prison official exhibits deliberate indifference when the official actually knows of and disregards a prisoner's serious medical needs." *Id.* (quotations marks and citations omitted). Deliberate indifference may be demonstrated by "prison guards intentionally denying

or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Orr v. Larkins*, 610 F.3d 1032, 1035 (8th Cir. 2010) (citation and quotations omitted).

Plaintiff alleges that she was diagnosed with gender dysphoria while incarcerated in the Missouri Department of Corrections and was actively undergoing prescribed medical treatment at JCCC. Plaintiff also alleges that "each Defendant was aware of her diagnosis" and that "Bade and Dobbins denied [Plaintiff] access to medical care when they refused to take her to her necessary mental health treatment." (Doc. #19, ¶¶ 144-45.) The Court thus finds that Plaintiff adequately alleges that Bade and Dobbins acted deliberately indifferent to her known, serious medical condition.

Defendants also argue that they are entitled to qualified immunity because Plaintiff cannot show that her right was clearly established when Bade and Dobbins denied her mental health treatment. The Court disagrees. As previously explained, the Eight Circuit has established that prison staff cannot interfere with medical treatment once prescribed. *Orr*, 610 F.3d at 1035; *see also White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988) (holding that gender dysphoria "is a serious medical need").

Finally, Defendants argue that Plaintiff "has not pleaded any facts to show a detrimental effect of any delay" in her mental health treatment. (Doc. #42, p. 7.) However, Plaintiff alleges Defendants' actions caused Plaintiff "to suffer physical injury, pain and suffering, loss of enjoyment of life, and severe emotional distress." (Doc. #19, ¶ 153.) At this stage of the litigation, Plaintiff has adequately alleged an injury under Count I and Defendants have failed to establish that Bade and Dobbins are entitled to qualified immunity on the face of the complaint.

### D. Counts I, II, III, IV, and VII against Lewis, Falkenrath, Petri, and Matthew

Counts I, II, III, and IV assert various § 1983 constitutional violations, and Count VII asserts a Missouri state-law assault and battery claim against Defendants. Defendants argue Lewis, Falkenrath, Petri, and Matthew should be dismissed from these claims because (1) Plaintiff failed to plead that these defendants directly participated in the alleged unconstitutional violations; (2) regarding the claims against Falkenrath, Plaintiff does not allege specific factual allegations to state a claim; (3) regarding Count VII, Plaintiff fails to allege these individuals used any force or made physical contact with Plaintiff.

As a threshold issue, the Court agrees with Defendants that Plaintiff must do more than rely on respondeat superior or general supervisor liability to state a § 1983 claim against Lewis, Falkenrath, Petri, and Matthew. "In a § 1983 case, an official 'is only liable for his . . . own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor liability." *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 677). "Further, a warden's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Ouzts v. Cummings*, 825 F.2d 1276, 1277 (8th Cir. 1987).

However, "[s]upervisors, in addition to being liable for their own actions, are liable when their corrective inaction amounts to 'deliberate indifference' to or 'tacit authorization' of the violative practices." *Howard v. Adkinson*, 887 F.2d 134, 137 (8th Cir. 1989) (citation and quotations omitted). "Proof of actual knowledge of constitutional violations is not . . . an absolute prerequisite for imposing supervisory liability . . . reckless disregard on the part of a supervisor will suffice to impose liability." *Id.* at 138; *see also Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990) (holding a warden's "action in denying the administrative appeals of [the

inmates'] disciplinary actions . . . clearly is sufficient to hold him liable" under a theory that the warden tacitly authorized the violative practices).

Defendants contend that Plaintiff only alleges that these defendants "rubberstamp[ed] the conduct" of the other individual defendants, which is insufficient to demonstrate their personal involvement in Counts I, II, III, and IV. (Doc. #42, p. 12.) Plaintiffs argue that Lewis, Falkenrath, Petri, and Matthew each denied Plaintiff's grievances and failed to take corrective action upon notice of constitutional violations against Plaintiff, all which constitute their personal involvement. The Court agrees with Plaintiff.

Plaintiff alleges that she attempted to aggrieve the March 2021 incident first by filing an IRR, which detailed constitutional violations. Petri and Matthew summarily denied the IRR. Plaintiff then filed an Offender Grievance, which was denied by a Warden's Response that failed to address the substance of Plaintiff's grievance. Plaintiff then filed another Offender Grievance, which was denied by Lewis, who found that Defendants' use of force on March 2021 was necessary. Plaintiff alleges that the denial of Plaintiff's grievances "failed to address the incident and complaints at issue, provided no accountability and, essentially, rubberstamped the aforementioned Defendants' treatment of [Plaintiff]." (Doc. #19, ¶ 88.) Plaintiff alleges under Count I, II, III, and IV that Lewis, Falkenrath, Petri, and Matthew's choice to ignore the constitutional violations amounted to "deliberate indifference to [Plaintiff's] vulnerability as a transgender woman and placed her in harm's way when they failed to take protective measures" and approved the other defendants' conduct. (Doc. #22, ¶ 148.) Like the warden in *Fruit*, who tacitly authorized the other prison official's conduct by denying the inmate's grievances and

otherwise failed to take corrective actions, Plaintiff here adequately alleges these defendants tactically authorized the other defendants' actions in the March 2021 incident.[4]

Second, Defendants argue that Plaintiff cannot rely on a theory that Falkenrath failed to train or supervise the other defendants because Plaintiff failed to allege that Falkenrath "was directly involved in making, implementing, or enforcing" a policy decision that led to the constitutional violations. (Doc. #42, p. 12.)

> When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.

*S.M. v. Krigbaun*, 808 F.3d 335, 340 (8th Cir. 2015) (citing *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)). As previously discussed, Plaintiff alleges that Falkenrath, through Plaintiff's use of the grievance process after the March 2021 incident, had notice of unconstitutional conduct against Plaintiff, and Falkenrath was deliberately indifferent by failing to take corrective action. The Court finds these allegations are sufficient to state a claim against Falkenrath under Counts I, II, III, and IV.

Finally, regarding Count VII, Defendants argue that the state-law assault and battery claim should be dismissed because Plaintiff "relies on the same rubberstamping allegations[.]" (Doc. #42, p. 13.) The Court rejects this argument for the same reasons it rejects this argument regarding Counts I, II, III, and IV. In turn, the Court finds Count VII states a claim against Lewis, Falkenrath, Petri, and Matthew.

---

[4] Defendant summarily argues that Plaintiff cannot demonstrate a clearly established right was violated. The Court finds that a supervisor's deliberate indifference towards, or tacit authorization of another prison official's unconstitutional conduct may hold a supervisor liable under § 1983 was clearly established at the time of the alleged misconduct. The Court thus rejects Defendants' argument.

### E. Counts II, III, IV, and VI against Defendants

Defendants argue that Counts II (Fourth Amendment Violation), III (Fourteenth Amendment Equal Protection Violation), IV (First Amendment Retaliation), and VI (First Amendment Retaliation) should be dismissed in their entirety against all defendants because (1) Plaintiff did not have a clearly established Fourth Amendment right under Count II; (2) Plaintiff did not have clearly established equal protection rights under Count III; (3) Plaintiff has not pled facts demonstrating that Defendants, including Mauler and Soone, took any retaliatory action that violated her First Amendment rights.[5]

Regarding Count II, violation of Plaintiff's Fourth Amendment rights, the Court finds that Plaintiff did have a clearly established right. As explained above, qualified immunity protects Defendants so long as they did not violate Plaintiff's "clearly established" constitutional rights. *Kulkay*, 847 F.3d at 642. The Eighth Circuit has clearly established that "prison inmates are entitled to Fourth Amendment protection against unreasonable searches of their bodies[.]" *Story v. Foote*, 782 F.3d 968, 970 (8th Cir. 2015) (citation and quotations admitted). Since at least 2001, the Eighth Circuit has held that the law:

> was clear that strip searches should be conducted in an area as removed from public view as possible without compromising legitimate security concerns. . . . The law was also clear that strip searches should be conducted by officials of the same sex as the individual to be searched. . . . Finally, the law was clear that strip searches should be performed in a hygienic fashion and not in a degrading, humiliating or abusive fashion.

*Richmond v. City of Brooklyn Ctr.*, 490 F.3d 1002, 1008 (8th Cir. 2007). Count II stems from Defendants allegedly "unnecessary and offensive touching" during their strip search of Plaintiff,

---

[5] Defendants summarily argue that the First Amendment rights in Count IV were not clearly established. However, as previously discussed, the Eight Circuit has long "recognized the First Amendment right to petition for redress of grievances includes redress under established prison grievance procedures." *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994). The Court finds this right applies to providing Plaintiff access to her PREA investigator.

which was performed in a "degrading, humiliating, and abusive manner," that left "[Plaintiff's] breasts exposed while Defendants carried her through the prison in view of male inmates to the Rubber Room" (Doc. #19, ¶¶ 158-59.) In turn, the Court finds that Count II adequately alleges Defendants violated a clearly established constitutional right.

Regarding Count III, Defendants argue that Plaintiff did not have clearly established Fourteenth Amendment rights. Count III arises out of Defendants preventing Plaintiff "from wearing clothes that conform to her gender identity, refused to refer to her by her preferred pronouns, subjected her to unnecessary force, stripped her clothes, and forced her to be displayed topless in front of male inmates—all conduct that similarly situated inmates are not subjected to." (Doc. #19, ¶ 173.) Plaintiff alleges that the "Equal Protection Clause prohibits JCCC officials from intentionally treating [Plaintiff] differently from similarly situated inmates without a rational basis related to a legitimate penological purpose." (Doc. #19, ¶ 171.) Taking Plaintiff's allegations as true at this stage of the litigation, the Court finds that Plaintiff has sufficiently alleged that Defendants violated her clearly established Fourteenth Amendment rights.

Finally, regarding Count IV, Defendants argue that Plaintiff does not demonstrate that any specific defendant took any retaliatory action that violated her First Amendment. Count VI is asserted against Epps, Falter, Dobbins, Bade, Petri, Matthew, Falkenrath, Lewis, and Mauler. The Court finds Plaintiff does allege specific conduct for each of these defendants. For example, Plaintiff alleges that Mauler, Sonne, and Dobbins took her personal belongings in retaliation for filing a grievance against Defendants. Plaintiff also alleges that Bade and Dobbins refused to provide Plaintiff with necessary mental health treatment, and Falter and Epps denied Plaintiff access to showers. She alleges none of the Defendants permitted her to visit the PREA

investigator she was originally scheduled to visit prior to the March 2021 incident. As previously discussed, Plaintiff adequately alleges that Lewis, Falkenrath, Petri, and Matthew were deliberately indifferent to and tactically authorized Defendants' First Amendment retaliatory conduct.

In turn, the Court finds that each count adequately states a claim against Defendants, and Defendants have not demonstrated they are entitled to qualified immunity on the face of the complaint. The motion is thus denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Partial Motion to Dismiss (Doc. #41) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: August 8, 2022